## Case No. 17,709.

### Case of WILLIAMS.

[Crabbe, 243;[1] 2 Law Rep. 104.]

District Court, E. D. Pennsylvania. March 8, 1839.

RECLAMATION OF FUGITIVE SLAVE — EVIDENCE OF IDENTITY—BURDEN OF PROOF.

[Where a person is claimed as a fugitive slave, under the act of Feb. 12, 1793, the question of identity can be proved only by inspection of the person, and, when such proof has been given, it may be disproved or discredited by clear proof of circumstances absolutely incompatible with it. But if such counter proof is doubtful, or, at least, not brought to a reasonable certainty, or may be consistent with the positive evidence of identity, the latter must prevail; subject, however, to the general rule that the burden of proof is on the party claiming the recovery.]

[This was a proceeding under the act of February 12, 1793 (1 Stat. 302), by Ruth Williams, claiming the delivery of "Isaac," or William Stansbury, as a slave.]

Mr. Ingraham, for claimant.

C. Gilpin and D. P. Brown, for respondent.

HOPKINSON, District Judge. The hearing of this case commenced on the 31st day of January last, and has been attended throughout the several sittings with an increasing excitement and interest. There are questions and circumstances involved in it calculated to give it more importance than ordinarily belongs to examinations of this description. On the one side we have a citizen of a sister state, coming here under the protection and authority of that state, claiming to have restored to her certain property, of which she alleges she has been unlawfully deprived; and insisting upon her right to my order to have this property delivered to her by the injunctions of the constitution of the United States, which I am bound to obey. In the other party, who denies and resists this claim, we have an individual who has lived among us for more than twenty-three years; has a wife and family of children depending upon him, and a home, from all which he must be separated, if the claimant has made good her right. These are considerations that make it peculiarly incumbent on the judge, who is to decide the question, and to decide it by the evidence that has been brought before him, to weigh that evidence carefully and scrupulously, without prejudice or influence from any other quarter. He is to yield nothing, on the one side to the power and patriotism of the state of Maryland, which have been strongly invoked for the cause of the claimant; nor, on the other, to any feeling for the consequence of his judgment to the respondent and his family; much less to any opinions of his own on the question of slavery.

Nobody recognises more fully and firmly than myself the complete legal and constitu-

[1] [Reported by William H. Crabbe, Esq.]

tional right of the owner of a slave in and to his person and services; no one is more deeply impressed than I am by the solemn guarantee, which those states of our Union, whose laws permit slavery to exist in them, have received and have a right to exact from every other state; that this right shall be faithfully regarded, and that if a person held to labor or service in one state by the laws thereof shall escape into another, he shall be delivered up to the party to whom such service or labor shall be due. This right it is my duty and desire to respect and secure, not only as a judge, sworn to respect and secure it, but as a citizen of the United States; firmly believing the union of these states to be our first and greatest blessing, and to maintain it, our highest duty; and knowing that it cannot be maintained but by a faithful performance of all its obligations and provisions by all the parties to it. In my view, the happiness of black and white, of the freeman and the slave, is intimately, I may say in our present circumstances, inseparably connected with the maintenance of that government, under which, and by which, we have attained an unexampled prosperity, and have secured to us every right which a rational people can wish for or enjoy. I make these remarks, because the topics to which they allude found no inconsiderable place in the argument of this case. I take the occasion, too, to observe, that the experience of this case, as well as many others, has shown that this mode of trial, directed by the act of congress, is better for both parties, especially for the person claimed as a slave, than a trial by jury could be. This hearing began on the last day of January; the claimant of course came prepared with the ordinary prima facie proof, sufficient, if uncontradicted, to entitle her to the possession of the respondent. He was taken suddenly in the street, without any notice or expectation of any such design or danger. He could not, therefore, be ready with his proofs and witnesses to repel the claim. It might be necessary to seek for them at a distance, and time was necessary for this purpose. After reading the documentary testimony of the claimant, and examining two of her witnesses, by which the respondent was fully apprised of the nature of the claim, the hearing was postponed, on his application, until the 16th of February. It was then resumed, and the claimant examined another witness, and closed her case. The defence was then entered upon and several witnesses were examined to support it. Another postponement was granted to the 23d of February, to enable the respondent to obtain other witnesses; and again to the 2d of March, when the respondent examined additional witnesses, and the claimant also produced another. It is obvious that a jury could not have been kept together for this length of time, and that much important evidence would have been excluded by a more hasty conclusion.

I will now proceed to an examination of the case, as it appears on the evidence that the parties have respectively offered; for it is only by that evidence, and not on any surmises or conjectures, conclusions or belief, not founded upon it, that I must raise my opinion. Judicially I can have no belief or opinion about it, but such as I can justify by the evidence. In the power of attorney, given by Ruth Williams, the claimant, to her grandson, William W. Hall, to prosecute this claim, she states that her negro man Isaac, who calls himself William Stansbury, absconded from her service on or about the 10th day of February, 1816. We have here an important date ascertained, which we must carry with us throughout the inquiry, which turns so much on the accuracy of dates. The whole controversy settles down into the question; whether the person now brought before me and who calls himself William Stansbury, is or is not the man Isaac who was the slave of William Williams, in his lifetime, and afterwards came into the possession of his widow, Ruth Williams, and who escaped from the service of Ruth Williams in the month of February, 1816. In short, it is a question of identity of person. This power of attorney bears date on the 19th day of January last, and was executed in consequence of a letter written to Mrs. Williams from George F. Alberti, dated at Philadelphia, on the 29th December, 1838. In that letter Mr. Alberti informed her, that he understood she had a slave named Isaac, alias William Stansbury, who absconded from her about the year 1815. He gives the name of Isaac's mother, and tells her, that his features are just the same as usual, and advises her how to proceed to have him arrested and delivered to her. It is no part of my business to inquire how Mr. Alberti got his information of a transaction which took place nearly twenty-three years before; I mention the letter only as being the commencement of this proceeding. Mr. Hall came to this city with his power of attorney and some witnesses to identify the person of Isaac. He was arrested in the street, and brought before me; I have given every opportunity to both parties to settle this question of identity, by their evidence, and will now, briefly as I can, compare the testimony offered, and endeavor to come to a satisfactory conclusion from the whole. Identity can be proved only by inspection of the person, and, when such proof has been given, it may be disproved or discredited by the proof of circumstances absolutely incompatible with it. But such circumstances must be clearly proved, and they must be absolutely irreconcilable with the direct proof of identity; for, if the counter proof is doubtful, or, at least, not brought to a reasonable certainty, or may be consistent with the evidence of identity, the direct and positive proof must prevail; subject, however, to the general and just rule of law which throws the burden of proof on the party who claims the recovery of that which is in the possession of another. If, therefore, the circumstances themselves and the proof of them be such as to bring the

testimony for the claimant into so much uncertainty and doubt, that the mind cannot be satisfied to rely upon it, the legal consequence is that it must fail. In short, the proof of identity by inspection will be sufficient, unless it be wholly discredited, or so impeached by contradictory evidence that the judgment cannot be satisfied to depend upon it. The proof of ownership, says the act of congress, must be "to the satisfaction of the judge." A conscientious witness will be cautious in his testimony of identity, and take care not to be too absolute and positive in his knowledge of it, for assuredly strange mistakes have been made upon this subject by witnesses, whose honest intentions could not be questioned. By a certificate from the register's office of Prince George county, Maryland, it appears that letters of administration were granted to Ruth Williams and James Beck on the personal estate of William Williams, deceased, on the 7th day of October, 1806, and in the inventory of the estate, we find a "boy named Isaac." about ten years old, appraised at $200. The respondent is claimed to be this boy Isaac; and the question is, whether he is so or not.

The first witness examined on the part of the claimant, was Beale Duval, whose manner of testifying and deportment throughout his examination was such as to impress us with the entire sincerity of his testimony. This witness now resides a few miles from the city of Baltimore, but in 1806 he resided in Prince George county, and did so until about two years past. about two or three miles from the house of William Williams; knows Mrs. Williams; was frequently at her house; there was a considerable family intimacy between them; knew all her servants for many years; he has seen the respondent a vast many times; has seen him at the house of his master and mistress, and at his (the witness's) house; he went by the name of Isaac; and was claimed by Mr. Williams as his slave to his death; after his death, Mrs. Williams always had him in possession; he was born on Mr. Williams's place; witness knew his mother; he had a brother, still in the family when witness left the county; don't recollect precisely when he ran away; he has been gone twenty years and upwards; witness said that he had no doubt that the respondent is the boy Isaac; he recognised him as soon as he saw him; he has a mark on his forehead, occasioned by a burn when young. The cross-examination related to the time when the witness heard of the claim now depending; and from whom he heard of it; at whose instance he came here; of seeing the respondent first in the street; when he knew him directly; that he was told by a young man that respondent was in the street, describing the place; had not seen him, until then. for upwards of twenty years: thinks that when Isaac went away he was between fifteen and seventeen years of age: he repeated. that he never saw a person he could recognise more certainly; he

is not much changed; has a beard now; but had not then; yesterday witness asked him if he knew him; he would not acknowledge it; would not commit himself, or own any of the transactions of which he spoke to him.

William Williams was the next witness. He said: "I reside in Prince George county; was born there; at fourteen years old went to Baltimore. for seven years, and then returned to Prince George; knows Mrs. Ruth Williams; knew Mr. Williams in his lifetime; Mr. Williams raised me until I was fourteen years old; am now forty-six; he died in 1805 or 1806; knew the boy Isaac from his infancy; he was nine or ten years old when Mr. Williams died; left him at the house of Mr. Williams when I went to Baltimore, and found him there when I returned; he ran away in 1815 or 1816; his mother and two brothers lived there at the same time; witness gave an account of the brother and mother of Isaac; this boy (Isaac) was always claimed by Mrs. Williams as her slave after the death of Mr. Williams; he had a mark on his forehead, occasioned by a burn; I recognised him as soon as I saw him; I understand he had an uncle named Nashe (Ignatius) Beck, who belonged to Joseph Beck, a brother of Mrs. Williams." On a cross-examination the witness said that Mr. Williams was his uncle and raised him; that he lived about four miles from Mr. Williams; was at his house twice or three times a week; "on my return from Baltimore. I saw Isaac at my store and at his mistress'; I spoke to Isaac yesterday; he said he did not know his master or mistress, mother or brother, or the state or county; that he did not know where he was born, nor where he came from."

John Riddle was sworn. He said he resides in Prince George county, Maryland; is forty-nine years old; has known him (the respondent) ever since he knew himself; lives three-quarters of a mile from Mrs. Williams; intimate in her family; knew her people; knew the boy named "Isaac," a yellow boy; "we were raised together; I was eight or ten years older than he; he was hired out; he was claimed by Mr. Williams in his lifetime as his slave, and by Mrs. Williams after his death; I always understood she took him as her part; I knew the mother of the boy; she was a slave to Mr. Williams; she bought her freedom, and now lives in Washington; the respondent is the same man; is not changed; saw his brother a few weeks ago at Mrs. Hall's, a daughter of Mrs. Williams; there is a strong resemblance between the brothers; I have no doubt that this is the man; he had a scar over one of his eyes; the witness points to the scar." Cross-examined: "I saw him a month or two before he went away; it is twenty odd years ago; about the time the war was ended."

With this evidence and the certificate of the letters of administration. and inventory of the personal estate of Mr. Williams. the counsel for the claimant closed his case,—

but at a subsequent hearing produced Dennis Duval as a witness, whose testimony I shall state here, that the whole of the claimant's evidence may be brought together. He was examined after several of the respondent's witnesses. He said: That he resides in Prince George county, and has done so all his life; is forty-nine years old; lives about one and a half miles from Mrs. Ruth Williams; always intimate in the family, visiting there constantly; knew all her people; knows the boy (the respondent); knew him at Mrs. Williams's house; "I recollect his running away; I think he was something like twenty years old; a stout youth; think he had a little mark on his forehead, occasioned by a burn; scalded; have not seen him since, until to-day; I recognised him immediately; can't recollect exactly the year he went away, but thought it was between 1817 and 1820; the fact was known in the neighborhood; he was advertised; I have no doubt that this is the boy." The cross-examination related to the question of his relationship to Mrs. Williams, and Beale Duval; he was related to neither, and the witness said, he was to have come here as a witness some weeks ago, but was sick; that he came at the request of Mrs. Williams; he had no conversation with her on the subject; she never showed him the letter (Alberti's) received from this quarter about the claim, nor did she speak of any; "she told me that her servant was here in prison, and asked me if I did not think I should know him; thinks the scar on the forehead was on the left side, but that it does not form any part of my recollection of him; his face is familiar to me; he had heard Mr. Williams (the witness) after his return home, say that Isaac had a mark; probably I might have asked Williams if he had a scar; I first saw him where he is now; nobody pointed him out to me as the person on trial;" the witness said he had been with Mr. Alberti and Mr. Hall the evening before, and the conversation was about the boy; he does not recollect what he said nor that he told them what he could prove; the witness said that on coming into the court room, Mr. Hall pointed out the man to him; he now says, "Mr. Hall, Williams, and myself came into the court room this morning, and I said, 'There sits the man;'" and on a question, he added, "Mr. Hall did not point him out to me, or point his hand towards him;" on a question put by the judge, who reminded him that he had said that Mr. Hall did point out Isaac to him, and showed the manner in which it was done, the witness replied, that he was satisfied that he was mistaken, when he said that Mr. Hall pointed out the man to him when they came into the court this morning.

I cannot but observe here the confusion and errors which this witness fell into in the course of his examination, not with any intention to impute any improper design to him; I do not believe he had any, but to claim some indulgence for other witnesses who have been treated, for similar mistakes, with great severity. In the first place, as to time, this witness thought that Isaac went away between the years 1817 and 1820, when this event happened in February, 1816; yet I do not doubt that Mr. Duval spoke to the best of his recollection. In the second place he stated as a fact that Isaac was advertised, and afterwards admitted he had never seen the advertisement, that he only heard so; that Mrs. Williams was the person who had told him so; now, as a very superior degree of intelligence has been claimed for the witnesses of the claimant, and been the subject of high eulogy, one would suppose that they knew the difference between hearsay, and a fact within their own knowledge, to which only they should testify. But a more remarkable instance of confusion or inadvertence in this witness is, that he said distinctly, that on coming into the court room, Mr. Hall pointed out the respondent to him; he afterwards said he did not, but that he immediately said "There sits the man;" and on my question, he said, he was mistaken when he said Mr. Hall pointed him out. I recollect no mistake so extraordinary as this in any other witness in the whole course of this examination; a fact was distinctly stated to have happened but two or three hours before it was given in evidence, and then it is withdrawn, the witness saying he was mistaken when he stated it. Again, this witness was in conversation, the evening before he gave his evidence, with Mr. Hall and Alberti, and he did not recollect what he said in this conversation; nor that he told them what he could prove. I most truly and seriously acquit this gentleman of any improper motives or intention to state a falsehood, or conceal the truth; he was evidently hurried and confused. But if this may happen to one of his standing and intelligence, it should not be visited too harshly upon those who are his inferiors in both, and whose inferiority has been pressed as a reason why their testimony should not be considered of equal or of any weight.

I have thus taken an ample review of the evidence by which Mrs. Ruth Williams has supported her claim to the labor or service of the person she has arrested and brought before me, under the name of Isaac, or William Stansbury. If that evidence cannot be disproved, or has not been disproved, it cannot be denied that it is sufficient to overflowing, to establish her right. It is clear, positive, and unhesitating, from witnesses of an undoubted character and intelligence, who cannot be suspected of any wilful misrepresentation, or any careless and culpable indifference to the consequences of their testimony, to themselves and to others. They have spoken confidently, what they truly believe; if their testimony and if the fact, that is, the identity of William Stansbury with the boy Isaac, who ran away from Mrs. Williams in February, 1816, be of a character about

which mistake cannot reasonably be presumed or believed, it must be admitted that her claim has been well established, and it would be hardly necessary to give any attention to the testimony produced on the part of the respondent. No one, however, of professional experience in trials at law, who has had opportunities of observing the errors which witnesses, of the best character, innocently fall into in delivering their testimony, not only of long past, but of recent transactions, will be willing to say that any evidence, from whatever witness it may come, may not be founded in some mistake. On the subject of the identity of persons, instances have occurred of the most surprising description. They have occurred in relation to brute animals, as well as to men. Controversies have arisen about the property of a horse, and numerous witnesses, of unexceptionable character, have testified for the one side and the other with equal positiveness. On one occasion, I think it was in Chester county, the horse was brought into the court room; was standing in the presence of the witnesses for their examination, when they gave their evidence, without producing the least change of belief in any one of them. The counsel for the claimant, adverting to the respondent's witnesses reminded us, how often highwaymen have escaped by having their confederates ready to prove an alibi, by an artful narration of circumstances, all true except as to the time. On the other hand, we should also remember the lamentable instances in which innocent persons have been convicted and executed as highwaymen, on proof of identity as positive as that we have in this case; not, I agree, with equal opportunities of knowledge, but with equal good faith in the witnesses.

I well remember a remarkable case, tried in June, 1804, in New York, in which the uncertainty of evidence of identity was wonderfully exemplified. I have since obtained a report of the trial. It was an indictment for bigamy against one Thomas Hoag, alias Joseph Parker. The question was whether the prisoner was the person who, under the name of Thomas Hoag, had married one Catherine Secor, four years before, having another wife then living. He denied that he was the man, or that Thomas Hoag was his name, and insisted that he was in name and fact Joseph Parker, and that he was never married to Catherine Secor. Numerous respectable witnesses, wholly disinterested, testified that the prisoner had lived and worked with them, that they knew him well, and that he was Thomas Hoag. Among the circumstances by which they knew him was a scar on his forehead, which the prisoner had. Benjamin Coe, one of the judges of the county court, testified that Hoag had lived and worked with him, that he had married him to Catherine Secor, and he was as much satisfied that he was Thomas Hoag, as

that he (the witness) was Benjamin Coe. Other witnesses swore to his identity with equal positiveness. But, what is more strange, Catherine Secor, the woman who was said to be his second wife, swore that she became acquainted with him in September, 1800; that he married her in December 25th, of the same year, and lived with her till the latter end of March, 1801, when he left her. She said, "I am as well convinced as I can be of anything in the world, that the defendant now here is the person who married me, by the name of Thomas Hoag." On the other side, witnesses equally respectable swore, with equal certainty, that the person was Joseph Parker; and they traced their knowledge of him living in the city of New York from time to time in the years 1799, 1800, 1801, with circumstances that made it impossible that he could have been in the county of Rockland, where the marriage with Catherine Secor was solemnized, at the period of that marriage. So the question stood, and was thus finally decided. Two of the witnesses for the prosecution testified that Thomas Hoag had a scar under his foot, occasioned by his treading on a drawing-knife; that the scar was easy to be seen. His feet were exposed to the court and jury, and no scar was there; and there was an end of the question. The prisoner was really Joseph Parker, and was not Thomas Hoag. But does anybody think of imputing the crime of perjury to the witnesses who swore positively, as well as circumstantially, without reservation, that he was Thomas Hoag? By no means.

It is therefore a mistake in the argument to say that if, upon the whole evidence of this case, the true or most probable conclusion should be that the respondent is really William Stansbury, and not Mrs. Williams' Isaac, any imputation of perjury, or of any other legal or moral offence, will rest upon her witnesses. We may therefore go to the examination of the evidence given on the part of the respondent, without any fear of taking anything, even by suspicion, from the respectable characters of the opposing witnesses.

In order to overthrow or disprove the evidence of the claimant, it is necessary that the respondent's evidence should be more certain, more satisfactory, less liable to mistake, than hers. If they are incompatible, as assuredly they are, if they cannot both be true, then we must take that which can be most safely relied upon. The object is to reach the truth of the case, through and by the evidence, and not to take anything to be truth from any prejudice or preconceived opinions, nor from surmises and suspicions, however strong they may be, and whatever disposition we may have to adopt them. For every fact to which I give my belief, I must be able to say, "Here is the proof of it."

As a preliminary remark to a review of

the respondent's testimony, I will observe that I have no faith in any one's recollection of dates and times, if he has nothing by which he can ascertain them but the mere act of his memory. On the other hand, if memory acts not upon the insulated point of time, but upon certain circumstances of a character to fix themselves on the memory, and the times of those circumstances are either of public and unquestionable notoriety, or can be proved by credible written documents, then it is obvious that the evidence is not to time, but to facts, and the time is ascertained by the facts thus proved. Justice to the respondent requires of me, although at the expense of considerable labor, to give the same careful examination of his testimony that I have given to that of the claimant.

The first witness was William Butler. He says he knew Stansbury about the year 1815; was in his company in New York. This is of little importance, for he mentions nothing by which this date is remembered, unless it can be connected with the testimony of Captain Whippey, so as to be corroborated by it.

George Melburn swears that he knows Stansbury; has known him ever since the war, and knew him during the continuance of the war. This witness here refers to a circumstance of public notoriety to fix the time of his acquaintance with Stansbury. He speaks of the building of the batteries on the west side of the Schuylkill for defence against an expected attack by the British. He says that he and Stansbury went out together with the colored people to assist in that work. He is certain they went together, and he knew him a year before that. Now, it is a fact of general notoriety that the colored people did go out to work at these batteries, and that this took place in the fall of 1814. If then it is true that the witness and the respondent went out together to this work, putting aside his declaration that he knew Stansbury a year before, it is undeniable that he cannot be Mrs. Williams's boy Isaac, who did not leave her service until February, 1816; that is, about sixteen months after the work alluded to. The witness adds that he is satisfied Stansbury is the man; he was intimate with him; that is, that he did not only see him on that occasion, but knew him before and after. He says he thinks that he knew him to be employed in throwing wood out of boats in 1811 or 1812; to this I pay little regard. On a close cross-examination he said nothing that appeared to weaken his testimony, and his manner betrayed no uneasiness of feeling. He gave a simple account of his own history.

Abraham Dutton knew Stansbury twenty-five years ago; he (the witness) was going in a sloop bringing wood to the city, and Stansbury was at the drawbridge, throwing the wood out. He fixes the time to be twenty-five years, because he lived at Mount Holly; it is twenty-seven years since he went there, and he lived there seven years, and saw Stansbury two years after he went there;

he knows from his marriage the time he went to Mount Holly; it will be twenty-seven years next December since he was married. This is not very satisfactory as to the time of his first knowledge of Stansbury, although his calculations are pretty accurate; but the defect is in fixing by any circumstances that he did know Stansbury while he lived at Mount Holly. If he is not mistaken in that, all the rest proves that he did know respondent several years before Isaac left the service of Mrs. Williams.

Ignatius Beck. This is a very important witness, and his testimony should be closely examined; for, if he has not uttered the most broad and unsheltered falsehoods, William Stansbury cannot be the claimant's man Isaac. The appearance of Beck, now far advanced in life, with the proof of it on his gray hairs, was without exception becoming; nor did a very severe cross-examination betray him into any impropriety or appearance of feeling. He is the brother of the mother of Isaac who absconded from Mrs. Williams. He has sworn distinctly that he knew Stansbury in 1810, or thereabouts; knew him before the war began; is satisfied of it. He then mentions the circumstances by which he fixes the time of his knowledge. He says he moved out of Seventh street into St. Mary's street, which was in 1810; that Stansbury, whom he had seen before, came and helped him to unload his furniture, and he has known him ever since; that is the man; he had got him to haul wood for him; he was away two or three years after he got acquainted with him, but in 1817 he saw him working along the wharves. Still, we have nothing but his memory to fix the time of his moving into St. Mary's street. He put this beyond a doubt by producing the receipts of his landlord, Robert Mercer, for rent,—the first receipt, in a book, dated December 10th, 1810, for three months' rent; another in June, 1811. No others were turned to. He said he moved there in the fall of 1810, before the receipt was shown; and he could not read. He says that his sister Amy, the mother of Isaac, came to see him (the witness) about ten years ago; stayed with him about nine or ten months; that he is not Stansbury's uncle; he said, from his age, and the respect the colored people had for him, they were in the habit of calling him sometimes "Uncle Beck," and sometimes "Father Beck." He is sixty-five or sixty-six years old. On cross-examination, he gave a particular account of the family of his old master, Joseph Beck; of his own manumission and history. He said he understood Stansbury to say that he came from the northward, somewhere about New Bedford. This may be connected with Captain Whippey's evidence. He stated a fact of much importance; that is, that during the visit of his sister Amy here ten years ago,—a visit which continued for nine or ten months, —he never saw her and Stansbury together. This is incredible, if she was the mother of

Stansbury and Beck his uncle. Unless this old man, so respectable in his appearance and demeanor, and unimpeached by a whisper against his veracity or general character, and contradicted by no one in the particular facts he has narrated; unless the whole of his story is a false and foul fabrication, a series of corrupt perjuries, it is not possible that William Stansbury is the runaway boy Isaac.

Jonathan Judas. He also speaks of the building of the batteries over Schuylkill; he was active in getting the colored people to go out and work; he got the names of those who agreed to go; among them was that of William Stansbury; the witness wrote his name down—this he says is the same person; he has been acquainted with him from that day to this; Stansbury went out with him; witness says he had the honor of being captain that day; they met, 360 in number, in the state house yard; Stansbury then appeared to be from 20 to 22 years old; never talked with him about the place he came from; witness was born in 1784. Is this all a fabrication? By what testimony, either to the facts themselves or to the credibility of the witness, is it proved to be so?

Henrietta Reading knows Stansbury, and first knew him in 1812, as she believes, from a circumstance that occurred, which was the wedding of Richard Paxson; which was on 1st April, 1813, and of his sister, which was on the 1st of May following; she became acquainted with Stansbury the fall before these weddings; has known him ever since. I do not lay much stress on this witness, for although it was proved by the records of the meeting that she was accurate as to the time of the wedding, she has mentioned no circumstance which enables her to say that it was the fall before these events that she knew Stansbury; it is mere memory of time unassisted by circumstances, or nearly so.

Amy Curry was brought here on my suggestion; she is the mother of Isaac who absconded from Mrs. Williams. I shall say but little of her testimony, as she stood in a most difficult situation, if this is her son. She however clearly and distinctly asserted that he is not. She said, pointing to the respondent: "This is not Isaac, he is none of mine." She spoke of the mark as being on Isaac's cheek differing from those who said it was on his forehead, as this man's is. It will be remembered that I asked this witness if she belonged to any religious society; she replied she did; to the Methodist. I then made a serious appeal to her conscience and her fears if she said anything untrue; reminding her that it would be no excuse for her that she did it to save her child; she said she knew all this, and persisted in her story. If she has deceived us, she has deceived herself more fatally. On her cross-examination she certainly fell into some contradictions, which may have their effect on her credit; but they were not more striking or strange than those of Mr. Dennis Duval. I would shelter them both by the same mantle of charity; she too was somewhat hurried and confused on her cross-examination. She also says that she did not see this man (Stansbury) during her visit to her brother, I. Beck, ten years ago.

The only remaining witness is Captain Whippey. He is confined in the debtor's apartment (from whence he was brought to testify), where the respondent has also been kept. After respondent had been there a day or more, he asked me (says the witness) if I had any recollection of coming from Nantucket, in 1810; his naming the sloop and the master's name, brought it to my recollection, that I was a passenger in her. He told me he was a boy at the time on board of her; I don't recollect anything of this man; but there was a colored boy on board, who ran away from the vessel on our arrival at New York; I asked him how he came to know me; he said that hearing my name mentioned in the prison, had led him to ask me the question; the boy, as far as I can recollect, was rather of a lightish cast. The witness then mentioned circumstances which were satisfactory to show that this voyage was performed in the winter of 1810. He also said that he had mentioned these circumstances to no one in the prison. Stansbury mentioned to him the year, the season of the year, and the name of the sloop and her master, all correctly. This is very powerful evidence, unless we may account for it by the supposition of the claimant's counsel, that is, that there is a colored man in the prison to whom all this happened, and that he made the communications to Stansbury, to use them for himself. This is an ingenious surmise, but where is the proof of it? If such was the belief of the counsel, it might have been at once verified by sending to the prison, or asking the question of the keeper of the prison, who was here in court with his prisoner. Why did he trust so important a matter to an argument, when it was susceptible of proof.

One circumstance remains to be noticed, which has been vehemently pressed by the counsel for the claimant. It is certainly not without its importance, although it is claiming too much for it to say it is conclusive on the whole case. It is alleged that the respondent has not, either at this hearing or to any of the witnesses, his friends and intimates, ever told who he is or where he came from. This is not strictly correct. Ignatius Beck testifies that he understood from Stansbury that he came from the northward, somewhere about New Bedford; and if he is the boy Captain Whippey spoke of, this is not improbable. It would have been more satisfactory to have had a better account of him; but his habitual silence on this subject and the want of more proof in relation to it, is but a circumstance of suspicion, that he has or may have some reason for saying nothing about it; still it is but a circumstance of suspicion. It cannot prevail against the mass of positive evidence he has brought to prove that whoever or whatever he may be, he is not the slave of Mrs. Williams. I cannot adopt the reasoning,

that because he does not show where he comes from, therefore he ran away from Mrs. Williams; that because he does not show who he is, therefore he is her boy Isaac. Unless we carry this circumstance out to this conclusion, it cannot avail the claimant, whatever suspicion it may throw on the respondent. What reasons he has for this concealment I do not know; but I cannot say that they have any reference to the claim or right of Mrs. Williams. On the contrary, they certainly cannot have any such reference, unless her witnesses have one and all sworn falsely. I will put a familiar case: A man is charged with having stolen property—say a horse—in his possession. On the trial the prosecutor swears postively that the horse is his and was taken from him on a certain day. If the defendant proves by numerous witnesses, to the satisfaction of the court, that he had the horse in his possession one year before the prosecutor lost his horse, and has had him ever since, is it any answer to such testimony to say, "You have not shown where you got this horse"? Is it not enough to show that it cannot be that which belonged to the prosecutor?

To the witnesses of the claimant I can freely say, "You have done no wrong; you have honestly testified to an opinion; for it is only to an opinion, which you truly and conscientiously believe; but you have been mistaken in a matter, on a question, as to which many honest men have been mistaken before you; and if you should now be satisfied that you were mistaken, you will rejoice that it has done no wrong." But if I were to discredit the witnesses of the respondent; if I were to treat their testimony as unworthy of belief, I could address no such consolatory language to them. I must say to them broadly and plainly, "You are branded and blackened with a foul crime before God and man, volunteered by you in the most unnecessary and wanton manner. You were not called upon to speak at all, if you knew nothing of the case; but if you did speak, you were bound to tell the truth and the whole truth, by the most solemn obligations." Dare I pronounce such a condemnation upon these people, unimpeached by any attempt upon their general good character and veracity, or by anything apparent in their conduct here to bring suspicion upon their evidence? In such a case, can I turn them all off as confederates and conspirators with the respondent to defraud the claimant of her property, while I am unable to lay my finger on a particle of evidence or a single circumstance to justify or defend such a course toward them? It may be well for counsel—for I presume it was truly his opinion—to dispose of all the testimony given for the respondent, by charging it in mass, to be falsehood and perjury; to have been fabricated by confederacies and conspiracies. He may be satisfied with his opinion, that the object of the counsel of the respondent is not the truth: but to encourge the poor wretches (as he designates the wit-

nesses of the respondent), who have come here in their perjuries; but as I have no such knowledge or opinion, I cannot found a decree upon them, nor in any manner adopt them. Nor can I agree with the counsel, that it is enough to discredit Beck that he is of the same race and color with the respondent. This would put these people in a strange and perilous condition. It would be enough to have a white witness, however connected with the claimant by the ties of neighborhood, friendship, or blood; however united with her in a common feeling and interest for such claims. By the law of this state, which I am bound to administer, in this respect, the black witnesses stand here as entirely competent as the white, and their credit is to be tried by the same rules and principles. I am no more authorized to say, nor disposed to say, that any witness for the respondent is to be discredited because he is of the same race and color with the respondent, than I would be to discredit for the same reason a witness for the claimant. Neither the law nor my sense of justice will warrant any such discrimination. There is one broad line of discrimination between the witnesses of the claimant and of the respondent. The first speak of the identity of a person they have not seen for twenty-three years, and who was then a youth, and can only deliver an opinion concerning it: they can only testify to recollection; to memory, after a long lapse of time; while the others speak of one they have seen constantly from time to time, for a longer period; who has never been out of their view for any great length of time; and of facts and circumstances, which must be true or false. It would be a strange principle for a court of justice to adopt, in trials of this sort, that no black witness is to be believed; that perjury must be presumed of all of them. The whole examination then is a mere mockery and waste of time.

It may be that these witnesses have imposed falsehoods upon me for truth; for in what case or by what color of witnesses may that not be? But I have no reason to presume it, or to believe it; and I do not. If they have done so, be it on their own consciences. I have done my duty in giving the weight to their testimony to which, in my judgment, it is entitled. I pretend not to look into the hearts of men: to discover the deceit that may be hidden there; nor do I incur any responsibility if I am so deceived. I confess that during the examination and discussion of the case, I have had, occasionally, doubts and misgivings about the truth of it. I am not even now entirely without them. How can it be otherwise under the pressure of such conflicting testimony? But I feel it to be my duty to decide it by the whole evidence. and by such a comparison and estimate of it as the rules of evidence have prescribed for cases of contradictory testimony; and not to yield my judgment to

surmises and suspicions that I cannot defend by just conclusions from the whole testimony.

In this case I must refuse the certificate applied for, and order William Stansbury to be discharged from the arrest.